**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Lindsay Moilanen**
**Russell J. Feldman**
**John C. Lehmann**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, New York 10004-2616**
**212-336-9144 (Feldman)**
**FeldmanR@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    Plaintiff,<br><br>          -against-<br><br>**CANAFARMA HEMP PRODUCTS CORP.,**<br>**VITALY FARGESEN, IGOR PALATNIK, FRANK**<br>**BARONE, and KIRILL CHUMENKO,**<br><br>                    Defendants. | **AMENDED COMPLAINT**<br><br>**21 Civ. 8211 (PGG)**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Amended Complaint

against Defendants CanaFarma Hemp Products Corp. ("CanaFarma" or the "Company"), Vitaly

Fargesen ("Fargesen"), Igor Palatnik ("Palatnik"), Frank Barone ("Barone"), and Kirill Chumenko

("Chumenko") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      Defendants perpetrated an investment offering fraud through which they raised millions of dollars from investors for a start-up hemp company called CanaFarma on the basis of misrepresentations about how investor money would be used as well as misrepresentations about the Company's business prospects.

2.      CanaFarma's stated business plan was to grow hemp at farms in New York and to sell hemp-based products such as chewing gum that it would market directly to consumers.

3.      From March 2019 through at least October 2020 (the "Relevant Period"), Defendants raised approximately $15 million from more than 60 investors around the world, including investors in the United States and in this District.

4.      Though investors were told their money would be used to fund CanaFarma's business operations, beginning in at least April 2019, Fargesen and Palatnik—"vice presidents" on paper but the controlling persons of the Company in reality—misappropriated at least $4 million of investor funds from these raises, either for personal use or for purposes unrelated to CanaFarma's business.  Defendants concealed this misappropriation from potential investors through the use of doctored financial projections backed up by phony agreements and invoices that were intended to make the payments appear as if they were for legitimate corporate expenses.

5.      Additionally, Defendants made or disseminated to investors numerous other material misrepresentations and omissions about the Company and its business prospects.  For example, through both written materials and oral presentations, Fargesen and Palatnik told potential investors that CanaFarma was a "fully integrated" company that was processing the hemp from its farms and using the resulting hemp oil in its products when, in reality, it had not processed any of this hemp and its products used hemp oil from third parties.  Defendants provided financial information to investors that misstated historical revenue numbers and included baseless projections about future

2

revenue that were unsupported by the Company's own internal forecasts. And, Defendants touted the quality of CanaFarma's management team, which was purportedly led by its CEO, Executive-1, while failing to state that, in reality, Executive-1 was CEO in name only, making no substantive decisions and taking direction from Fargesen and Palatnik.

6.      Investors paid as much as $0.50 for each share of CanaFarma stock they bought through Defendants' securities offerings. Today, those shares are worth a fraction of what these investors paid.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, Defendants CanaFarma, Fargesen, and Palatnik have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      By virtue of the foregoing conduct and as alleged further herein, Defendants Barone and Chumenko have violated Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and (3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Amended Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.     The Commission seeks a final judgment:  (a) permanently enjoining Defendants from violating the federal securities laws and rules this Amended Complaint alleges they have violated; (b) ordering CanaFarma, Fargesen, and Palatnik to disgorge the ill-gotten gains they received with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants Fargesen, Palatnik, Barone, and Chumenko from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Defendants Fargesen, Palatnik, Barone, and Chumenko from participating in any offering of a penny stock, pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  During the Relevant Period, CanaFarma maintained offices in Manhattan that Fargesen and Palatnik used for CanaFarma business and investor

meetings.  Additionally, certain acts, practices, transactions, and courses of business alleged in this Amended Complaint occurred within this District, including Defendants' meetings with potential investors and their sales of CanaFarma securities to at least 11 investors located in Manhattan as part of the fraudulent offerings that are the subject of this Amended Complaint.

## DEFENDANTS

15.      **CanaFarma** is a Canadian corporation with offices in Vancouver, Canada, Morganville, New Jersey, and, during the Relevant Period, Manhattan.  CanaFarma incorporated in June 2017 under the name KYC Technology Inc. ("KYC").  In March 2020, as part of a reverse merger, KYC acquired CanaFarma Corp. ("CF Corp."), a privately-held Delaware corporation, and thereafter changed its name to CanaFarma.  Beginning in March 2020 and thereafter, CanaFarma became listed on the Canadian Stock Exchange ("CSE") (ticker: CNFA.CN) and the Frankfurt Stock Exchange ("FSE") (tickers: 4K9.F, 4K9.MU, and 4K9.BE), and is quoted on an unsolicited basis on OTC Markets (ticker: CNFHF).

16.      **Fargesen**, age 54, resides in Manalapan, New Jersey.  Fargesen is a co-founder of CanaFarma along with Palatnik, with whom Fargesen has worked on various business ventures for more than 20 years.  During the Relevant Period, Fargesen was Senior Vice President of Strategic Planning at CanaFarma and, at various points, a member of the board of directors.  In an indictment unsealed on October 5, 2021, Fargesen was criminally charged by the U.S. Attorney's Office for the Southern District of New York ("USAO SDNY") with securities fraud, wire fraud, and conspiracies to commit both securities fraud and wire fraud in connection with the CanaFarma investment offering fraud described herein.  *See United States v. Vitaly Fargesen*, 21 Cr. 602 (S.D.N.Y.) (the "Criminal Case"). On October 10, 2023, Fargesen pled guilty in the Criminal Case, pursuant to a superseding information, to one count of conspiracy to commit securities fraud and to one count of conspiracy to commit wire fraud for related conduct.

17.     **Palatnik**, age 49, resides in Morganville, New Jersey.  Palatnik is a co-founder of CanaFarma along with Fargesen, with whom Palatnik has worked on various business ventures for more than 20 years.  During the Relevant Period, Palatnik was Senior Vice President of Product Acquisition at CanaFarma and, at various points, a member of the board of directors.  Palatnik had also been charged in the indictment in the Criminal Case with securities fraud, wire fraud, and conspiracies to commit both securities fraud and wire fraud in connection with the CanaFarma investment offering fraud described herein. On October 10, 2023, Palatnik pled guilty in the Criminal Case, pursuant to a superseding information, to one count of conspiracy to commit securities fraud and to one count of conspiracy to commit wire fraud for related conduct.

18.     **Barone**, age 55, resides in Holmdel, New Jersey.  During the Relevant Period and until January 2021, Barone served first as CanaFarma's Senior Vice President of Sales & Marketing (until April 2020) and then as its chief operating officer.  Barone also served as a director of CanaFarma until March 2020.  Barone and Chumenko have worked together for more than 15 years on various health supplement and cosmetics companies that used direct-to-consumer marketing. On October 18, 2023, pursuant to an information filed in the Criminal Case, Barone was charged with and pled guilty to one count of securities fraud, one count of wire fraud, and one count each of conspiracy to commit securities fraud and conspiracy to commit wire fraud.

19.     **Chumenko**, age 47, resides in Los Angeles, California.  During the Relevant Period and until January 2021, Chumenko served as CanaFarma's Senior Vice President of Sales & Marketing.  Chumenko also served as a director of CanaFarma until March 2020.  Chumenko and Barone have worked together for more than 15 years on various health supplement and cosmetics companies that used direct-to-consumer marketing. On October 18, 2023, pursuant to an information filed in the Criminal Case, Chumenko was charged with and pled guilty to one count of

securities fraud, one count of wire fraud, and one count each of conspiracy to commit securities fraud and conspiracy to commit wire fraud.

**FACTS**

I.      **BACKGROUND ON CANAFARMA**

        A.      **Founding of the Company**

20.      Fargesen and Palatnik founded CanaFarma, which would be a "farm-to-table" hemp company that would grow its own hemp, process that hemp into hemp oil, and then sell products containing that hemp oil directly to consumers.

21.      Fargesen and Palatnik founded a private United States company first (CF Corp.) with the intention of then merging that private company into a Canadian shell company in order to enable the resulting company to be listed on stock exchanges both internationally and, ultimately, in the United States.  This type of transaction is referred to as a "reverse merger."

22.      Fargesen and Palatnik incorporated CF Corp. in March 2019.  At that time, Fargesen was the president of CF Corp., while Fargesen and Palatnik were each 50% owners and directors.

23.      Using a strawman (a friend of Fargesen's), in or about March 2019, Fargesen and Palatnik purchased a Canadian shell (KYC) from Canadian Bank-1.

24.      As of at least April 21, 2019, Fargesen, Palatnik, Executive-1, Barone, and Chumenko each owned 10 million shares of CF Corp.

        B.      **Doctored Financial Projections**

25.      In or about late 2018, Fargesen and Palatnik contacted Barone and Chumenko to see if they would assist with the sales and marketing side of a hemp-based company, which became CanaFarma.

26.     Fargesen and Palatnik told Barone and Chumenko that they (Fargesen and Palatnik) had prior experience taking companies public, they had identified a public shell to be used for this process, and they had secured the required investor commitments.

27.     Barone and Chumenko agreed to be responsible for product development and direct-to-consumer marketing, with Barone primarily handling the development and marketing itself and Chumenko primarily handling related financial and accounting tasks.

28.     During the Relevant Period, Barone and Chumenko both served as Senior Vice Presidents of Sales and Marketing at CanaFarma.

29.     In order to facilitate the direct collection of credit card payments from customers, Barone and Chumenko used multiple nominees to open bank accounts that Barone and Chumenko secretly controlled.

30.     Barone and Chumenko then used these nominee bank accounts to process additional credit card payments from CanaFarma customers, thereby exceeding bank risk limits related to credit card processing for this kind of direct marketing business.

31.     Barone and Chumenko used an existing company they controlled, Company-1, to provide sales and marketing services to CanaFarma.

32.     Company-1 provided sales and marketing services to CanaFarma pursuant to an agreement between Company-1 and CF Corp. dated as of April 22, 2019.

33.     The agreement between Company-1 and CF Corp. contained a financial model showing the projected revenue and expenses of CanaFarma over its first two years (the "Model"). Included in these expenses was a projected marketing budget for Company-1.

34.     Barone and Chumenko prepared initial drafts of the Model, which projected approximately $25 million in revenue for CanaFarma for its first year of operations.

35.     At the direction of Fargesen, however, Barone and Chumenko made changes to the Model. These changes included the addition of approximately $1.35 million to the "set-up" and other near-term costs for the sales and marketing efforts of Company-1.

36.     Fargesen directed that these changes be made in order to disguise an expected series of payments to Fargesen and Palatnik.

37.     Fargesen and Palatnik told Barone and Chumenko that they would use these funds to make advance payments on an overseas stock promotion and price support campaign in Europe and not for legitimate corporate expenses.

38.     Barone and Chumenko made these requested changes to the Model, which was then included as an exhibit to the agreement between Company-1 and CF Corp.

39.     Fargesen and Palatnik used the financial projections included in the Model to solicit potential investors in CanaFarma, including potential investors located in the United States, as is described more fully below.

40.     Barone and Chumenko knew that the Model and its financial projections would be used to solicit potential investors, some of whom they knew to be located in the United States.

**C.     Fargesen and Palatnik Controlled CanaFarma**

41.     Fargesen and Palatnik maintained complete control over CanaFarma during the Relevant Period.  This meant, among other things, that Fargesen and Palatnik led and directed all fundraising from investors, all corporate decisions, and all disbursements of funds from Company bank accounts.

42.     Fargesen and Palatnik hired Executive-1 as the Company's CEO in March 2019.

43.     Fargesen and Palatnik told Executive-1 and others at CanaFarma that Executive-1 would act as a mere figurehead CEO and would not make any actual decisions.

44.     CanaFarma maintained bank accounts at two banks during the Relevant Period—U.S. Bank-1 and U.S. Bank-2.

45.     Fargesen and Palatnik opened the CanaFarma bank account at U.S. Bank-1 in March 2019 and were the only two people with signature authority on the account.

46.     Executive-1 opened the CanaFarma bank account at U.S. Bank-2 in April 2019.

47.     Though Executive-1 initially had signature authority on the CanaFarma bank account at U.S. Bank-2, Palatnik directed Executive-1 first to add Palatnik as a signer on the account on or about May 14, 2019, and then to remove Executive-1 as a signer on or about June 19, 2019.

**D.      Products and Hemp Farms**

48.     CanaFarma primarily sold a chewing gum containing hemp oil directly to customers during the Relevant Period.

49.     CanaFarma did not manufacture this product itself; rather, it obtained the product pursuant to a license agreement with a third party (Licensor-1), and then sold that product under its own brand name ("Yooforic").

50.     CanaFarma leased two hemp farms during the Relevant Period.

51.     The first hemp farm, which CanaFarma leased from April to December 2019, was located in Dutchess County, New York.

52.     The second hemp farm, which CanaFarma leased from February 2020 through the end of the Relevant Period, was located near Syracuse, New York.

53.     Using investor funds, CanaFarma made a total of at least $3.5 million in combined payments for hemp "grows" at these two hemp farms in 2019 and 2020.

54.     Though these farms grew and harvested hemp, CanaFarma did not process any of this hemp into hemp oil and, accordingly, did not use any of this hemp in any of its products during the Relevant Period.

55.     Instead, the hemp grown as part of the 2019 and 2020 grows that CanaFarma funded was kept in storage, unused.

56.     Licensor-1 used hemp oil purchased from a different source—that is, not the hemp grown at the farms licensed by CanaFarma—to produce Yooforic.

57.     On or about April 17, 2019, Fargesen told an individual with whom Fargesen and Palatnik were discussing CanaFarma's business that CanaFarma was making payments to the first hemp farm "just for the story." Palatnik was also present for this conversation.

58.     CanaFarma began generating revenue from the sales of its product in June 2019.

59.     During its first six months of generating revenue—June 2019 through November 2019—CanaFarma generated a total of approximately $3.1 million in revenue.

60.     In September 2019, CanaFarma generated approximately $832,000 in revenue, the most revenue it generated in a single month during the Relevant Period.

61.     By February 2020, however, CanaFarma's monthly revenue dropped to approximately $68,000.

62.     Thereafter, CanaFarma's monthly revenue continued to drop, to approximately $44,000 in March 2020 and only approximately $26,000 by June 2020.

63.     Fargesen and Palatnik were aware of CanaFarma's monthly revenue numbers during the Relevant Period.

## II.     CanaFarma's Securities Offerings

64.     During the Relevant Period, CanaFarma raised approximately $15 million from investors around the world, including in the United States, through two securities offerings.

65.     First, between March and November 2019, CF Corp. raised approximately $11.3 million from investors through private sales of shares of CF Corp. (the "First Offering").

66.     Second, in June 2020, CanaFarma raised more than $3.7 million from investors through private sales of shares of CanaFarma (the "Second Offering").

67.     Between the two offerings, in March 2020, KYC completed its reverse merger with CF Corp. and became listed on the CSE and the FSE.

68.     At the time of the reverse merger, Fargesen, Palatnik, Barone, and Chumenko each still owned 10 million shares of CF Corp.

69.     After the reverse merger, Fargesen and Palatnik each owned 8,727,749 shares of CanaFarma.

70.     More than 60 investors located in seven states and ten countries invested in either the First Offering or the Second Offering, including at least 11 investors located in Manhattan.

71.     Executive-1, Fargesen, or Palatnik typically sent prospective investors in both offerings a subscription agreement, a business plan or investor presentation, and a shorter summary of the Company's business and the investment opportunity (the "Investment Materials").

72.     When Executive-1 sent the Investment Materials by email to a potential investor, Executive-1 typically wrote that Executive-1 did so at the request of Fargesen or Palatnik.

73.     In communications with potential investors, including in emails sending the Investment Materials, Executive-1 represented that Executive-1 was the CEO of CanaFarma.

74.     Fargesen and Palatnik then met or spoke with potential investors to pitch the Company and the investment opportunity.  Certain of these meetings took place in Manhattan, including at CanaFarma's offices.

75.     Fargesen and Palatnik principally drafted the portions of the Investment Materials that described the offerings (which included setting the Company's valuation and price per share) and CanaFarma's structure and business.

76.     Barone and Chumenko provided information for inclusion in the Investment Materials and reviewed copies of the Investment Materials provided to potential investors in both the First Offering and the Second Offering.

77.     The Investment Materials provided to potential investors in both the First Offering and the Second Offering stated that CanaFarma had offices in Manhattan and listed a Manhattan office address as the address for Executive-1, to whom an investor was required to return a signed subscription agreement.

78.     Investors in the First Offering paid either $0.10 or $0.25 per share.

79.     Investors in the Second Offering paid approximately $0.50 per share (or $0.63 per share in Canadian dollars).

**III.    Misappropriation of Investor Funds**

80.     The Investment Materials provided to potential investors in both the First Offering and the Second Offering either state explicitly or imply that investor funds would be (and previously had been) used for CanaFarma business purposes.

81.     For example, one version of the summary document sent to investors in the First Offering stated that the money raised from investors "will be used primarily for the funding of additional grow facilities and as the marketing dollars to fuel our direct response marketing engine."

82.     Similarly, in a later version of the subscription agreement used in the First Offering, investors were told that CanaFarma would use their money for "general working capital purposes and for expenses incurred in connection with listing the Company's common stock on the [CSE.]"

83.     Investment Materials provided to certain investors in the First Offering stated that CanaFarma had already raised $6 million or $7 million for the Company.

84.     Investment Materials provided to investors in the Second Offering stated that CanaFarma had already raised $12 million for the Company.

85.     In reality, however, Fargesen and Palatnik misappropriated at least $4 million from CanaFarma bank accounts during the Relevant Period.

86.     In each of the following four examples, Fargesen and Palatnik either transferred the funds themselves or directed others to transfer the funds out of CanaFarma bank accounts (which were funded primarily with money from investors) to another entity, Direkt Finance, LLC ("Direkt"),  or to CanaFarma's largest shareholder, Shareholder-1.

87.     Palatnik was and is the sole owner and member of Direkt.

88.     Not only did Defendants not disclose any of these payments to subsequent investors (including in the Investment Materials), but they either disguised the payments in the budgets and projections provided to investors or reversed the payments months later.

**A.     Example 1**

89.     Between April 25, 2019, and July 19, 2019, Fargesen and Palatnik misappropriated more than $1.35 million invested in the First Offering through a series of transfers that ended with transfers to Direkt.

90.     Fargesen and Palatnik transferred these funds out of CanaFarma's bank account at U.S. Bank-1 using a combination of wire transfers and checks (which were signed by Fargesen).

91.     Fargesen and Palatnik told Barone and Chumenko that they planned to use these funds to pay overseas stock promoters and affiliates in order to manipulate the stock price of CanaFarma once it became listed on the FSE.

92.     In order to disguise the payments as part of the marketing budget for Company-1, Fargesen directed that the Model include approximately $1.35 million in additional set-up and marketing costs for Company-1.

93.     Barone and Chumenko assisted Fargesen and Palatnik by inflating these costs in the Model.

94.    At the direction of Fargesen and Palatnik, Barone and Chumenko also prepared, or directed employees to prepare, false invoices that broke the payments into multiple tranches and indicated that the initial payments by CanaFarma (to Company-1) were for legitimate marketing services.

95.    Fargesen and Palatnik also instructed that the payments be routed through multiple bank accounts—including the bank account for Company-1 and another entity that Barone and Chumenko controlled—before reaching Direkt.

96.    Bank records for Direkt show that Fargesen and Palatnik used these funds not for legitimate marketing expenses but instead for personal expenses, for checks written to themselves, or to fund their personal bank accounts.

**B.    Example 2**

97.    Between September 26, 2019, and October 31, 2019, Fargesen and Palatnik transferred a total of $2 million from CanaFarma's bank account at U.S. Bank-1 (which primarily held funds from investors in the First Offering) to Shareholder-1's company.

98.    Fargesen and Palatnik caused CanaFarma to make these payments to Shareholder-1's company because Shareholder-1 requested that the Company return a portion of Shareholder-1's family's multimillion dollar investment in the Company.

99.    Shareholder-1 did not, however, return the CanaFarma shares that CanaFarma had issued in exchange for this investment.

100.    At the direction of Palatnik, Executive-1 signed a sham consulting agreement on behalf of CanaFarma with Shareholder-1's company, which purported to serve as the basis for the $2 million in payments made by CanaFarma to Shareholder-1's company.

101.    Executive-1 signed this agreement on or about October 19, 2019, which was after CanaFarma had already transferred $1.5 million of the $2 million to Shareholder-1's company.  The agreement was dated as of September 23, 2019, three days before the first payment.

102.    In or about May 2020, Fargesen and Palatnik admitted to Barone and Chumenko that the true purpose of the $2 million in payments to Shareholder-1's company was to return a portion of Shareholder-1's family's investment.

103.    Fargesen and Palatnik also admitted to Barone and Chumenko that they (Fargesen and Palatnik) knew that Shareholder-1's company submitted documents to the Company concerning services that were never provided in order to substantiate the payments.

104.    After CanaFarma's auditors and others at CanaFarma raised questions about these payments, on June 15, 2020, Shareholder-1's company sent $1,665,000 back to CanaFarma.

105.    Shareholder-1's company retained the balance of these funds—$335,000—as payment for purported social media marketing work that Shareholder-1's company did not actually perform.

**C.    Example 3**

106.    Between January 24, 2020, and February 28, 2020, Fargesen and Palatnik misappropriated an additional $374,000 from CanaFarma bank accounts, which were primarily funded with investor money from the First Offering.

107.    Fargesen and Palatnik transferred these funds out of CanaFarma's bank account at U.S. Bank-1 by wire transfer. The wire transfers themselves state that the payments were for a "roadshow."

108.    Fargesen and Palatnik stated to others at CanaFarma that these payments represented prepayments for a CanaFarma investor roadshow to take place in Europe.

109.     In reality, bank records for Direkt show Fargesen and Palatnik used these funds for personal expenses (including the purchase of a luxury car) or to fund their personal bank accounts.

110.     No roadshow, let alone one in Europe, ever took place.

**D.     Example 4**

111.     In July 2020, CanaFarma's monthly sales revenue was approximately $33,000.

112.     In August 2020, Fargesen, Palatnik, and Shareholder-1 agreed to a "revenue recycling" scheme to inflate CanaFarma's sales revenues that were reported to investors.

113.     Specifically, Fargesen, Palatnik, and Shareholder-1 agreed that (a) Fargesen and Palatnik would transfer funds out of CanaFarma's bank accounts to companies controlled by Shareholder-1 overseas, as payment for fictitious services, and (b) other companies controlled by Shareholder-1 would then send the funds back to CanaFarma at a later date as purported sales revenue from product sales that did not in fact occur.

114.     On or about September 17, 2020, at the direction of Palatnik, CanaFarma transferred a total of $350,000 out of its bank account at U.S. Bank-2 through two separate wire transfers to two companies controlled by Shareholder-1.  These transfers were primarily funded with investor funds from the Second Offering.

115.     In October 2020, CanaFarma received a total of $376,250 back from a third company controlled by Shareholder-1.

116.     CanaFarma did not disclose in any of the Investment Materials that it would use investor funds for phantom transactions intended to create the appearance of higher sales revenues.

**IV.     Additional Material Misrepresentations and Omissions to Investors**

117.     The Investment Materials provided to investors falsely stated that CanaFarma had an "integrated" business that included the processing of hemp into hemp oil that was then used in the Company's products (*i.e.*, Yooforic-branded products such as chewing gum).

118.     For example, in the business plan provided to potential investors in the First Offering, CanaFarma stated that it was "the only producer in the CBD market with its own . . . Processing facility." In the summary provided along with that business plan, CanaFarma stated that it was a "fully integrated cannabis company addressing the entire cannabis spectrum from seed to delivery of consumer products."

119.     In another investor presentation provided to potential investors in the First Offering, CanaFarma described its business as "vertically integrated – cultivation, processing and sales of hemp oil infused products."  Fargesen was listed as the CanaFarma contact person in this investor presentation.

120.     Similarly, in an investor presentation provided to potential investors in the Second Offering, CanaFarma described its "Vertical Integrated Hemp Business" as follows:  "From seed to counter, our fully integrated hemp business helps us promote in-demand hemp oil infused products that continue to fuel the direct response marketing engine."  The investor presentation then includes "processing" as one of the ways CanaFarma's business was "integrated."

121.     This investor presentation also stated that CanaFarma "independently grows, produces, promotes, sells, and ships our own products," and that the Company had as a "notable resource" its own "Fully Certified, Clean Processing Facility."

122.     In addition to written materials, during investor presentations, Fargesen orally gave potential investors in at least the First Offering the impression that CanaFarma grew and processed its own hemp and then used the resulting hemp oil in its products.

123.     In reality, CanaFarma did not process any of the hemp that was grown at the farms it leased during the Relevant Period, and none of the products it sold contained hemp oil from the hemp grown at these farms.

124.    By the time of the Second Offering, CanaFarma's first hemp grow remained unprocessed and was sitting unused in storage.

125.    The business plan sent to potential investors in the First Offering contained a section with purported "Testimonials" given by some of the "first users" of "the Company's superior differentiated product."

126.    In reality, these testimonials were not related to CanaFarma's product (Yooforic chewing gum) at all; rather, they were testimonials for another hemp-based product that CanaFarma never sold.

127.    Fargesen and Palatnik included these misleading testimonials in the business plan.

128.    The Investment Materials provided to potential investors contained misrepresentations and omissions about past and projected sales revenues.

129.    For example, Investment Materials for the First Offering "guaranteed" $25 million and projected as much as $100 million in first-year revenue for CanaFarma.

130.    In reality, Barone and Chumenko, the CanaFarma employees directly responsible for the product development and marketing work that drove these revenue projections, projected (but did not guarantee) $25 million in first-year revenue.

131.    Additionally, as described in the Investment Materials for the First Offering, the revenue projections were based on a marketing budget of $3 million that would be used "to pay the affiliate networks for the sales that they generate."

132.    As described above, however, this $3 million marketing budget included $1.35 million that Fargesen and Palatnik misappropriated from the Company, which was not used for marketing work.

133.    Not only was this misappropriation not disclosed to potential investors, but the Investment Materials for the First Offering stated that the Company used a "pay for performance" marketing model where it "does not incur a marketing expense unless actual sales are made."

134.    In the Second Offering, an investor presentation stated that CanaFarma had surpassed $4 million in revenue in either its first six months of sales or its "first quarter," and that in March 2020, the Company was "[n]ow achieving nearly $1,000,000 per month revenue."

135.    None of these statements were true.  In reality, CanaFarma achieved approximately $3.1 million in revenue in its first six months of sales and only approximately $44,000 in revenue in March 2020.  CanaFarma never reached $1 million in monthly revenue during the Relevant Period.

136.    Because Fargesen and Palatnik were aware of CanaFarma's monthly revenue numbers during the Relevant Period, they knew or were reckless in not knowing that these statements to potential investors in the Second Offering were false and misleading.

137.    The Investment Materials provided to potential investors in both offerings touted the high quality of CanaFarma's management team, suggesting it was headed by Executive-1 as CEO and that Fargesen and Palatnik were mere officers who reported to Executive-1.

138.    In reality, Executive-1 simply signed documents and took direction as to all aspects of the business from Fargesen and Palatnik.

139.    The Investment Materials did not disclose that Executive-1 was acting as a mere figurehead CEO, nor did Defendants otherwise disclose that information to investors.

140.    The Investment Materials provided to potential investors in at least the First Offering also stated that the owners of Licensor-1—the third-party from which CanaFarma was licensing its hemp oil chewing gum—were part of the CanaFarma organization.

141.    For example, organizational charts contained in the Investment Materials provided to potential investors in the First Offering described the owners of Licensor-1 as part of the Company's "Management Team" and indicated that they reported to Palatnik.

142.    In reality, neither the owners of Licensor-1 nor Licensor-1 itself were part of CanaFarma at all.

## V.    The CanaFarma Shares Sold to Investors Qualified as a Penny Stock

143.    The shares of CanaFarma stock sold to investors in both the First Offering and the Second Offering qualified as a penny stock as defined by Exchange Act Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder:  (a) CanaFarma stock was not an "NMS stock," as defined in 17 C.F.R. § 242.600(b)(47); (b) CanaFarma stock traded below five dollars per share during the Relevant Period; (c) CanaFarma had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1); and (d) CanaFarma did not meet any of the other exceptions contained in Rule 3a51-1.

144.    As of today, November 28, 2023, CanaFarma is being quoted at approximately $0.0001 per share on OTC Markets.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(CanaFarma, Fargesen, and Palatnik)**

145.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

146.    Defendants CanaFarma, Fargesen, and Palatnik, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a

material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

147. By reason of the foregoing, Defendants CanaFarma, Fargesen, and Palatnik, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and 17(a)(3)
### (Barone and Chumenko)

148. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

149. Defendants Barone and Chumenko, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, and/or (ii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

150. By reason of the foregoing, Defendants Barone and Chumenko, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (CanaFarma, Fargesen, and Palatnik)

151. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

152.     Defendants CanaFarma, Fargesen, and Palatnik, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

153.     By reason of the foregoing, Defendants CanaFarma, Fargesen, and Palatnik, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder
### (Barone and Chumenko)

154.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 144.

155.     Defendants Barone and Chumenko, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

156.     By reason of the foregoing, Defendants Barone and Chumenko, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant CanaFarma and its agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Defendant Fargesen and his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

### III.

Permanently enjoining Defendant Palatnik and his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

### IV.

Permanently enjoining Defendant Barone and his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) promulgated thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)];

## V.

Permanently enjoining Defendant Chumenko and his agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) promulgated thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)];

## VI.

Ordering Defendants CanaFarma, Fargesen, and Palatnik to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## VII.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## VIII.

Permanently prohibiting Defendants, Fargesen, Palatnik, Barone, and Chumenko from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## IX.

Permanently prohibiting Defendants, Fargesen, Palatnik, Barone, and Chumenko from

participating in any offering of a penny stock, including engaging in activities with a broker, dealer,

or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of

any penny stock, under Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section

21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## X.

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
        November 28, 2023

                                /s/ Antonia M. Apps

                                ANTONIA M. APPS
                                REGIONAL DIRECTOR
                                Thomas P. Smith, Jr.
                                Lindsay Moilanen
                                Russell J. Feldman
                                John C. Lehmann
                                Attorneys for Plaintiff
                                SECURITIES AND EXCHANGE COMMISSION
                                New York Regional Office
                                100 Pearl Street
                                Suite 20-100
                                New York, New York 10004-2616
                                212-336-9144 (Feldman)
                                FeldmanR@sec.gov